IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **HOLLY V. ADAMS**, | |
| Plaintiff, | **Case No. 2:19-CV-4970** |
| **v.** | **Judge Graham** |
| **STEALTHBITS TECHNOLOGIES, INC.**, | **Magistrate Judge Jolson** |
| Defendant. | |

## OPINION AND ORDER

Plaintiff Holly Adams brings this action asserting violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12112 to 12117; common law violations of Ohio public policy; and breach of contract. She alleges that defendant Stealthbits Technologies, Inc. ("Stealthbits") discriminated against her because she has Major Depression. Stealthbits counterclaims that Adams breached a contract, breached a duty of good faith and fair dealing, and misappropriated confidential and/or proprietary information in violation of Ohio and federal law. This matter is before the Court on Stealthbits' motion for summary judgment. For the reasons below, Stealthbits' motion, Doc. 65 is **GRANTED** in part and **DENIED** in part.

### I.       Background

The facts of this case are viewed in a light most favorable to Adams.

Adams has extensive experience in sales. She was a salesperson for Johnson and Johnson for seven years and Quest/Dell Solutions for ten years. Doc. 72-1 at ¶ 9. She left sales in 2014 to work at her family business and have more time to raise her young children. Doc. 72-1 at ¶ 7; 72-4 at 8. In spring of 2018, Michael Ruggieri, her former manager at Quest and current sales vice president of Stealthbits, contacted Adams. Doc. 72-1 at ¶ 6. He inquired whether Adams wanted

1

to return to sales and work for Stealthbits, a cybersecurity software company. Doc. 72-1 at ¶ 6. Adams accepted and, on May 14, 2018, was hired as an enterprise account executive. Doc. 65-4 at 2. Her job responsibilities included selling Stealthbits' portfolio of software products. Doc. 65-4 at 2. On May 24, 2018, Adams signed Stealthbits' Proprietary Information and Inventions Agreement ("PIIA"). Doc. 65-12.

Adams was diagnosed with Major Depression decades ago and had successfully controlled her symptoms with medication. Doc. 72-1 at ¶ 4. In April of 2019 she began experiencing symptoms again. Doc. 72-1 at ¶ 12. More specifically, she began "experiencing a foggy brain, forgetting customers names, . . . taking three to four times longer to complete an email or complete tasks, feeling overwhelmingly depressed and anxious and wanting to stay in bed all day and finding it extremely hard to be focused, energetic, and positive . . . ." Doc. 72-1 at ¶ 12. She consulted her primary care doctor and psychiatric professionals throughout April and May 2019. Doc. 72-1 at ¶ 13. She was diagnosed with resistance to depression medications and was prescribed new medications in late April 2019 with minor changes on May 6, 2019. Doc. 72-1 at ¶ 17. On May 6, 2019, Adams told her primary care doctor that the medications were not working and that she was concerned about not being able to perform at work. Doc. 72-1 at ¶ 18. Her primary care doctor informed her that the new medications would take four to six weeks to reach full efficacy and advised her to seek a short leave at work. Doc. 72-1 at ¶ 18; *see also* Doc. 73 at 3-4.

Adams attempted to obtain short-term leave on May 8, 2019. The sequence of events is in dispute. Adams' version is as follows:

> 5. Over the years periodically my medication would need to be adjusted to keep my Major Depression in Remission, due to hormonal changes from childbearing.
>
> . . . .

2

18. On my May 6, 2019 visit with Dr. Huston, I discussed my concern that the new medicine was not working, and she said it take[s] 4 to 6 weeks to reach full efficacy and we discussed my concern of not being able to perform at work and she advised [me] to speak with my employer's Human Resources Department for the short leave while my body adjusts to the new medication.

19. Upon the advice of my Doctor, I contacted the HR Department on May 8, 2019, and spoke with Ms. Danielle Potshantek, to let STI know of my medical condition and need for a short medical leave to adjust to my medication.

. . . .

21. On May 8, 2019, in my initial conversation with Ms. Potshantek, after informing her of my condition I requested information of what were my options for a short medical leave to adjust to my new depression medication and I told her I thought 4 to 6 weeks as that is how long it typically takes to adjust.

22. Ms. Potshantek responded by asking if a reduced work schedule would work and I responded that I really needed a short leave to allow the new medicine to take full effect and focus on getting better and that I would like to start on May 10th after work because I needed time to put together a report for my manager on my deals and because of my difficulty concentrating I knew I would need a couple of days.

23. During the same initial call, Ms. Potshantek stated something to the effect of suggesting starting with a 3-week check point and reassess if more time were needed, which I was agreeable to, but she said she would look into what my options where [sic] for medical leave and would get back to me.

24. About an hour later Ms. Potshantek called me back and said I did not qualify for FMLA and that May 10, 2019 would be my last day.

25. I was stunned and confused and said I did not want to be terminated and she said well you do not qualify for FMLA, and she never offered me any paperwork to fill out for other short term medical leave that is listed in the employee handbook.

26. Ms. Potshantek never gave a reason why a short medical leave of 4 to 6 weeks or even the 3 weeks that was suggested would be a hardship or not reasonable.

27. Ms. Potshantek then emailed me on May 8, 2019, the same day, COBRA information.

28. I discussed the matter with my supervisor several times on May 8th thru the 10th, trying to understand why they were firing me for my disability, or did I

> misunderstand, and thought maybe they just did not understand my history of
> how I have been successfully treated for years and that it will only take 4 to 6
> weeks, so I tried to engage in several discussions to discus options.

Doc. 72-1 at ¶¶ 5, 18, 19, 21-28.

Potschantek's recollection is materially different. Potschantek recalls that Adams requested to go on leave of six to eight weeks, but with the caveat that the exact duration of leave was undetermined because Adams was not sure how long it would take for the medication to take effect. Doc. 65-6 at 8-9. She asserts that Adams never requested four to six weeks leave. Doc. 65-6 at 13. However, she had heard from Jay Levis, Adams' direct supervisor, sometime between May 8, 2019 and May 10, 2019 that Adams needed four to six weeks leave. Doc. 65-6 at 13-14. Potschantek also recalls that it was not until the callback (when she informed Adams that Adams was ineligible for FMLA) that she suggested that Adams have a reduced work schedule. Doc. 65-6 at 11. Adams rejected the suggestion, asserting that she needed to stop working altogether and that she scheduled May 10, 2019 to be her last day. Doc. 65-6 at 11. Because Adams was insistent on leaving May 10, 2019, Potschantek did not discuss the option of a disability leave of absence. Doc. 65-6 at 11. Nor, Potschantek asserts, did she "go into that in[ter]active process . . . ." Doc. 65-6 at 12. Potschantek does not recall discussing the possibility of a three week leave. Doc. 65-6 at 16-17.

Feeling that she had been wrongfully terminated, Adams, prior to her last day, printed documents containing customer information to show that she was doing her job. Doc. 65-5 at 26-27. She gave all the documents to her attorney. Doc. 65-5 at 31.

On May 10, 2019, Adams texted the Chief Executive Officer of Stealthbits, Steve Cochran, asking whether she was terminated. Doc. 72-1 at ¶ 31. She did not instantly receive a response. She then called Levis. *See* Doc. 72-1 at ¶ 30. Levis did not believe Cochran knew that Adams was

requesting leave due to her depression and recommended she ask Cochran for a meeting. Doc. 72-7 at 0:13:34-0:13:45; 0:22:18-0:22:30. Adams then, through an email to Cochran, requested a short-term leave and explained that she wanted to keep her job and needed a short leave because she feared her depression was hindering her work performance. Doc. 73 at 5-6.

When Adams had not received a reply by May 13, 2019, she emailed Cochran, Potschantek, and Levis to again inquire on the status of her employment. Doc. 72-1 at ¶ 32. Potschantek requested a teleconference with Adams and Nick Manosour, Chief Operating Officer of Stealthbits. Doc. 72-1 at ¶ 32. Adams clearly expressed on the teleconference that she felt she was being fired. Doc. 65-6 at 28. Potschantek insisted that this was not the case – that Adams had quit. Doc. 65-6 at 28. In her deposition, Potschantek explained that she understood Adams to quit because "when an employee tells you they're unable to work as of a certain date, this is how we move forward." Doc. 65-6 at 28. Potschantek still did not offer Adams disability leave as an option because, she says, Adams did not have an estimated return date. Doc. 65-6 at 29. Instead, she assured Adams that her job would be ready for her when she was ready to return. Doc. 65-6 at 29.

Potschantek emailed Adams a separation agreement and instructions for returning the company laptop on May 16, 2019. Doc. 72-1 at 4. The separation agreement contained a provision calling for a severance payment to be made and a general liability waiver. Doc. 40 at 126-28. In addition, the separation agreement provides "[t]o the extent that Employee has any work-related files, emails, data, or information in electronic form on Employee's personal devices (or accessible therefrom), Employee further agrees to delete all such files, e-mails, data, and information." Doc. 40 at 127. Adams refused to sign the separation agreement.

Adams' counsel, through a letter dated July 14, 2019, requested that Stealthbits rehire Adams with a three-year contract. Doc. 65-11. Stealthbits declined to do so.

Adams filed suit on November 10, 2019. Doc. 1. She alleges in her second amended complaint violations of the Americans with Disabilities Act of 1990 ("ADA") (Claims I – VI), violations of Ohio Public Policy (Claims VII – XII), and breach of contract (Claim XIII). Doc. 40. Stealthbits filed counterclaims asserting breach of contract (Counterclaim I), misappropriation of trade secrets under Ohio and federal law (Counterclaims II and III), and breach of the duty of good faith and fair dealing (Counterclaim IV). Doc. 48 at 29-32. On April 12, 2021, Stealthbits moved for summary judgment on Adams' claims and its counterclaims. Doc. 65.

## II.    Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper if the evidentiary materials in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Longaberger Co. v. Kolt*, 586 F.3d 459, 465 (6th Cir. 2009). The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original); *see also Longaberger*, 586 F.3d at 465. "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment." *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008) (quoting *Anderson*, 477 U.S. at 248). Accordingly, the nonmoving party must present "significant probative evidence"

to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. *Daugherty*, 544 F.3d at 702; *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994). Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009).

## III.     Discussion

### A. Americans with Disabilities Act ("ADA") Claims

Adams asserts the following ADA claims: failure to provide reasonable accommodation (Claim I), failure to engage in the interactive process in good faith (Claim II), termination because of disability (Claim III), termination in retaliation for exercising right to request a reasonable accommodation (Claim IV), failure to rehire in retaliation for exercising right to request a

reasonable accommodation and refusing to sign away protective rights (Claim V), and discrimination by unequal treatment (Claim VI). Doc. 40.

In order to establish a *prima facie* case of discrimination, a plaintiff must show: (1) she is disabled; (2) she is otherwise qualified for the position, with or without reasonable accommodations; (3) she suffered an adverse employment decision; (4) the employer knew or had reason to know of the plaintiff's disability; and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced. *Monette v. Electronic Data Systems Corporation*, 90 F.3d 1173, 1186 (6th Cir. 1996). The burden then shifts to the employer to produce evidence of a legitimate, nondiscriminatory reason for its actions. *Id.* at 1185. If the employer does so, the employee must "demonstrate by a preponderance of the evidence that the legitimate reason offered by the employer was in fact only pretext designed to mask retaliation." *Id.* at 1185-86

### 1. Voluntary Resignation

Stealthbits asserts Adams' ADA claims fail because she voluntarily resigned. "When an employee voluntarily resigns, he cannot claim that he suffered an adverse employment decision under the ADA . . . ." *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 447 (6th Cir. 1999) (citation omitted). There are two kinds of voluntary resignation – constructive resignation and effective resignation. *Id.* at 448. Stealthbits' argument relies on effective resignation. *See* Doc. 65-1 at 11. An effective resignation requires that (1) the employee express an intention to resign and (2) the employee take some action to demonstrate that he is relinquishing his position. *Hammon*, 165 F.3d at 448. Both steps need not be taken at the same time. *Id.* This analysis considers the "objective manifestations of an employee's intent rather than evidence of subjective intent." *Pownall v. City of Perrysburg*, 63 F. App'x 819, 822 (6th Cir. 2003). The first element requires only that the

employee express an intent to end his or her employment – no particular phrase is required. *See Baechle v. Energizer Battery Mfg., Inc.*, No. 1:09 CV 217, 2010 WL 2342473, at *11 (N.D. Ohio June 9, 2010).

Regarding the first element, Stealthbits asserts that "Adams' persistent request to stop working almost immediately cannot be construed as anything other than an intent to resign . . . ." Doc. 65-1 at 11. The Court disagrees. Adams asserts in her declaration that she went to Potshantek to ask what her "options [were] for a short medical leave to adjust to [her] new depression medications and [] told her [that] 4 to 6 weeks [was needed] as that is how long it typically takes to adjust." Doc 72-1 at ¶ 21. Adams then explained to Potshantek that she "would like to start [leave] on May 10th after work because [she] needed time to put together a report for [her] manager . . . ." Doc. 72-1 at ¶ 22. When Potshantek said that May 10th would be Adam's last day, Adams explained that she "did not want to be terminated." Doc. 72-1 at ¶ 25.

Viewing the facts in a light most favorable to Adams, a jury could conclude that the objective manifestations of Adams' statements expressed a request for medical leave and not an intention to quit. A jury could further find that Adams reasonably understood Stealthbits to be firing her because she needed to take time off and did not qualify for FMLA leave. Therefore, a jury could conclude that Adams did not voluntarily resign from her position.

## 2. *Reasonable Accommodation*

Stealthbits next argues that the ADA claims fail because Adams' request for leave was unreasonable as a matter of law. Doc. 65-1 at 12. The reasonable accommodation analysis consists of two steps. First, the plaintiff bears the burden of articulating a "plausible accommodation, the cost of which, facially, do not clearly exceed its benefits." *Cehrs v. Ne. Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 781 (6th Cir. 1998) (quotation and citation omitted). Then the employer bears

the burden of proving that the accommodation is unreasonable and imposes an undue hardship. *Id.* Stealthbits asserts only that Adams failed to bear its burden of articulating a plausible accommodation.

The Sixth Circuit has found that medical leave can, in some circumstances, constitute a reasonable accommodation under the ADA. *Id.* at 783; *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 394 (6th Cir. 2017). Factors courts consider include the length of the requested leave, whether leave was provided previously, and whether the duration is definite. *See Walsh v. United Parcel Serv.* 201 F.3d 718, 727 (6th Cir. 2000) ("We therefore hold that when, as here, an employer has already provided a substantial leave, an additional leave period of a significant duration, with no clear prospects for recovery, is an objectively unreasonable accommodation."); *Maat v. Cty. of Ottawa, Mich.*, 657 F. App'x 404, 412 (6th Cir. 2016) ("[T]he length of leave requested is not the only determinant of the reasonableness of an accommodation. Importantly, where an employer has already provided an employee with a lengthy period of medical leave, an extension to that leave can be a reasonable accommodation only when its duration is definite.").

Stealthbits asserts that the lack of a return date, by itself, renders Adams' leave objectively unreasonable. Doc. 65-1 at 12-13. The cases on which it relies do not support this position. For example, in *Cooley v. East Tennessee Human Resources Agency, Inc.*, the Sixth Circuit found an *extension* of leave to be an unreasonable accommodation where the employee was unable to provide a certain or credibly proven return date. 720 F. App'x 734, 741 (6th Cir. 2017). The Sixth Circuit did so by faithfully relying on its decision in *Maat* that a certain or credibly proven return date is required when the employer already provided a lengthy period of medical leave. *See id.* at 741. Neither *Cooley*, *Maat*, nor any other binding precedent cited by Stealthbits found a first

request for a leave to be unreasonable because only an expected duration, rather than a specific return date, could be provided.

Viewing the facts in Adams' favor, a jury could find that she is able to carry the burden of showing a medical leave would have been a reasonable accommodation. Even though Adams did not provide a specific return date, she did provide an expected duration. And while the duration requested is in dispute – Adams says it was four to six weeks while Potschantek says it was six to eight weeks – Adams expressed a willingness to try Potschantek's proposal to start with a three-week period.[1] Whether three, or four to six, or six to eight weeks, a jury could reasonably conclude that the cost of the leave is not clearly exceeded by the benefit of Adams controlling her Major Depression.

### 3. Interactive Process

Stealthbits next moves for summary judgment on Adams' Claim II, failure to participate in the interactive process in good faith. The interactive process is used to identify the limitations resulting from a disability and potential reasonable accommodations that could overcome those limitations. 29 C.F.R. § 1630.2(o)(3). "Both parties have a duty to participate in good faith." *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 871 (6th Cir. 2007) (citation omitted). "An employee has the burden of proposing an initial accommodation, and the employer has the burden of showing how the accommodation would cause an undue hardship, but the employer is not required to propose a counter accommodation in order to participate in the interactive process in good faith." *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 202–03 (6th Cir. 2010) (citation

---

[1] Stealthbits argues that only Adams' self-serving statements support that she requested four to six weeks of leave. Doc. 79 at 7. This is incorrect. Levis stated in his deposition that he understood Adams needed four to six weeks of leave. Doc. 65-7 at 7.

omitted). If a reasonable counter accommodation is offered, the employee cannot demand a different accommodation. *Id.* at 203 (citation omitted).

Stealthbits contends that it engaged in the interactive process in good faith, as evidenced by Potschantek offering a counter accommodation. Doc. 65-1 at 16-17. Potschantek did listen to Adams' request for leave and ask whether a reduction in work hours would help, but this brief exchange may not necessarily indicate that they engaged in the interactive process. Potschantek never commented on any hardship that Adams' leave would cause. Moreover, Potschantek stated in her deposition that she and Adams did not "get into the in[ter]active process and go down that route." Doc. 65-6 at 12.[2]

To the extent the reduction in work hours constitutes a counter accommodation, Stealthbits has not established that it was a reasonable counter accommodation. Adams was concerned that her depression symptoms prevented her from being able to perform at work. Doc. 72-1 at ¶ 18. Her doctor recommended that Adams take a short leave while her body adjusted to the new medication. Doc 72-1 at ¶ 18. A jury could conclude, based on this evidence, that Stealthbits terminated Adams without considering her initial accommodation request and therefore failed to engage in the interactive process in good faith. Thus, Stealthbits is not entitled to summary judgment on Claim II of Adams' second amended complaint.

### 4. *Failure to Rehire*

Claim V of Adams' second amended complaint asserts that Stealthbits retaliated against Plaintiff in violation of the ADA by failing to rehire her. Doc. 40 at 10. Stealthbits asserts that this claim should be dismissed because Adams sought reemployment under materially different terms.

---

[2] Stealthbits also asserts that Adams failed to initiate the interactive process because she failed to present a reasonable accommodation. Doc. 65-1 at 16. As already explained, a jury could find that Adams' request for "a short medical leave" was a reasonable accommodation. Doc. 72-1 at ¶ 21.

Doc. 65-1 at 17. In other words, Stealthbits argues that it met its burden in producing evidence of a legitimate, nondiscriminatory reason for not rehiring Adams.

The Court agrees. The only communication indicating that Adams sought employment with Stealthbits was a letter from Adams' counsel.[3] This letter requested that Stealthbits provide Adams a "three (3) year employment contract that provides her the security that she will not be fired unless she fails to meet her yearly sales quota (the same quota in all three years as in 2019)." Doc. 65-11 at 3. In contrast, Adams' prior employment with Stealthbits was at will. Under the employment-at-will doctrine, either party may terminate the relationship at any time for any legal reason or no reason. *Wright v. Honda of Am. Mfg., Inc.*, 653 N.E.2d.3d 571, 574 (Ohio 1995). To the extent that Adams desires the Court consider the letter to be an application, the demand for a three-year employment contract represents a materially different term from her previous at-will status. Stealthbits has proffered a legitimate, nondiscriminatory reason for declining her offer, which Adams has failed to show was pretext to retaliation. To the extent Adams bases her claim on Stealthbits' failure to make an offer once they knew she was better, the court finds that the failure to affirmatively seek out and offer employment to Adams does not constitute an adverse employment action. *See Gamble v. Greater Cleveland Reg'l Transit Auth.*, No. 18-3526, 2019 WL 2404277, at *2 (6th Cir. Apr. 3, 2019) (finding that a person did not suffer an adverse employment action when they were not an applicant at the time of hiring). Therefore, Claim V of Adams' second amended complaint is dismissed.

---

[3] Adams asserts that the letter is inadmissible as a settlement discussion under Fed. R. Evid. 408. Doc. 72 at 18. Rule 408 provides that statements made during compromise negotiations are not admissible to prove or disprove the validity or amount of a dispute claim or to impeach by prior inconsistent statement or a contradiction. It "only bars the use of compromise evidence to prove the validity or invalidity of the claim that was the subject of the compromise, not some other claim." *Uforma/Shelby Bus. Forms, Inc. v. N.L.R.B.*, 111 F.3d 1284, 1293-94 (6th Cir. 1997). Here, the letter was in relation to Adams' discrimination claim. Defendants now seek to use it as evidence against the entirely different discriminatory failure to rehire claim. The letter is admissible for this purpose.

**B. Ohio Public Policy Claims**

Adams brings claims identical to her ADA claims based on Ohio Public Policy. Stealthbits asserts Adams' Ohio Public Policy claims fail for the same reasons as her ADA claims. Doc. 65-1 at 17. Stealthbits argument reveals that it misunderstands Adams' claims. Ohio's disability discrimination law, Ohio Rev. Code §§ 4112.02 and 4112.99, and the ADA do generally rise and fall together. *See Jakubowski*, 627 F.3d at 201. But Adams claims are not, and indeed could not be, brought under Ohio's disability discrimination law. Ohio's disability discrimination law applies to employers who employ four or more persons within the state. Ohio Rev. Code Ann. 4112.01(A)(2). Adams was Stealthbits' only employee in Ohio.

Instead, Adams' Ohio public policy claims are common-law torts. A brief history of this type of claim is helpful. Ohio generally follows the common-law doctrine of employment at will. *Leininger v. Pioneer Natl. Latex*, 875 N.E.2d 36, 39 (Ohio 2007) (citation omitted). Over time, Ohio courts recognized that an exception to the at-will doctrine was necessary when conduct was prohibited, but adequate recourse was not available. *See id.* When multiple sources express a public policy, "the statute containing the right and remedy will not foreclose recognition of the tort on the basis of some other source of public policy, unless it was the legislature's intent in enacting the statute to preempt common-law remedies." *Collins v. Rizkana*, 652 N.E.2d 653, 660 (Ohio 1995) (citation omitted). It is under this precedent that Adams brings her public policy claims, a fact Adams made abundantly clear in her response brief, Doc. 72 at 16-17.

*1. Wrongful Discharge*

Adams alleges two wrongful discharge claims: (1) that she was terminated because of her disability (Claim IX) and (2) that she was terminated in retaliation for exercising her right to

14

request a reasonable accommodation (Claim X). Doc. 40 at 16-18. To prove these claims, Adams must show:

(1) That clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the *clarity* element).

(2) That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the *jeopardy* element*).*

(3) The plaintiff's dismissal was motivated by conduct related to the public policy (the *causation* element).

(4) The employee lacked overriding legitimate business justification for the dismissal (the *overriding justification* element).

*Collins*, 652 N.E.2d at 657-58 (citation and quotation omitted) (emphasis in original).

The first element, known as the clarity element, requires that the public policy be expressed through a state or federal regulation, statute, administrative regulation, or common law. Adams' claims are based on the prohibition against employment discrimination on the basis of disability found in Ohio Revised Code § 4112.02(A). The Ohio Revised Code defines "disability" as:

[A] physical or mental impairment that substantially limits one or more major life activities, including the functions of caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working; a record of a physical or mental impairment; or being regarded as having a physical or mental impairment.

Ohio Rev. Code § 4112.01(A)(13). Whether a condition constitutes a disability must be decided on a case-by-case basis. *Shaver v. Wolske & Blue*, 742 N.E.2d 164, 173 (Ohio Ct. App. 10th Dist. 2000) (citing *Hood v. Diamond Products, Inc.*, 658 N.E.2d 738, 742-743 (Ohio 1996)).

Stealthbits has not presented any argument or evidence contesting Adams' claim that her Major Depression constitutes a disability in this case. For purposes of summary judgment, the Court will presume that public policy forbids employment discrimination against Adams based on her Major Depression.

The jeopardy element is satisfied when the public policy would be compromised absent the common-law public policy claim. *Leininger*, 875 N.E.2d at 41. Public policy will not be

compromised when the statutory scheme expressing the policy contains a full array of remedies. *Id.* at 42. The Ohio Supreme Court has held that Ohio Revised Code Chapter 4112 adequately protects the public policy against employment discrimination. *Id.* at 44. However, Chapter 4112 applies only to employers with four or more employees in Ohio. Ohio Rev. Code § 4112.01(A)(2). It does not adequately protect the public policy against employment discrimination where the employer employs three or less people in Ohio. *Collins*, 652 N.E.2d at 660-61. Here, Stealthbits has only one employee in Ohio. Thus, assuming Adams' Major Depression constitutes a disability, the jeopardy element is satisfied.

The causation element requires that the dismissal be related to the public policy. *Id.* at 657. Here, the parties dispute whether Adams was dismissed, and Adams has presented sufficient evidence in support of her claim that Stealthbits dismissed her because they refused to accommodate her request for leave to treat her Major Depression.

The overriding justification element requires that the employer lacked an overriding business justification for the dismissal. *Id.* at 658. Stealthbits has not presented any evidence or argument on this element.

In sum, questions of material fact remain on whether Stealthbits dismissed Adams and, if so, whether it was caused by Adams Major Depression or in retaliation to requesting leave, and whether Stealthbits had an overriding legitimate business justification for the dismissal. Therefore, Stealthbits is not entitled to summary judgment on Claims IX and X of Adams' second amended complaint.

### 2. *Other Ohio Public Policy Claims*

The second amended complaint alleges other Ohio public policy claims consisting of failure to provide reasonable accommodations (Claim VII), failure to engage in the interactive

16

process in good faith (Claim VIII), failure to rehire Adams in retaliation for exercising her right to request reasonable accommodations and refusing to sign away protective rights (Claim XI), and discrimination by unequal treatment (Claim XII). Doc. 40 at 14-20.

Ohio courts have limited the public policy doctrine to claims for wrongful discharge or discipline. *See Noble v. Genco I, Inc.*, No. 2:10-CV-648, 2010 WL 5541046, at *5 (S.D. Ohio Dec. 30, 2010); *Bools v. Gen. Elec. Co.*, 70 F. Supp. 2d 829, 832 (S.D. Ohio 1999) ("our review of Ohio law finds no case extending the public policy tort to claims involving a wrongful failure to hire or retaliation."). Thus, Adams' other Public Policy claims (Claims VII, VIII, XI, and XII) are dismissed.[4]

### C. Contract Claims

Stealthbits moves for summary judgment on its two contract-based counterclaims – breach of contract, Counterclaim 1, and breach of implied covenant of good faith and fair dealing, Counterclaim IV. These claims are based on an alleged breached of section nine of the PIIA, which provides:

> When I leave the employ of the Company, I will deliver to the Company any and all drawings, notes, memoranda, specifications, devices, formulas, and documents, together with all copies thereof, and any other material containing or disclosing any Company Inventions, Third Party Information or Proprietary Information of the Company. . . .

Doc. 65-12 at 5. The PIIA further provides that it is governed by the laws of New Jersey. Doc. 65-12 at 5.

---

[4] Despite purporting to move for summary judgment on all claims, Stealthbits makes no argument regarding Plaintiff's breach of contract claim, Claim XIII. The Court accordingly finds that Stealthbits failed to meet its burden on summary judgment regarding Claim XIII.

1. *Breach of Contract*

Under New Jersey law, "[t]o prevail on a breach of contract claim, a party must prove a valid contract between the parties, the opposing party's failure to perform a defined obligation under the contract, and the breach caused the claimant to sustained damages." *EnviroFinance Grp., LLC v. Env't Barrier Co., LLC*, 113 A.3d 775, 787 (N.J. Super. Ct. App. Div. 2015) (citation omitted).

Stealthbits alleges that Adams breached the PIIA in two ways – by performing a factory reset on her company laptop and by maintaining documents after the conclusion of her employment. Doc. 65-1 at 19. The PIIA provides:

> RETURN OF COMPANY DOCUMENTS. When I leave the employ of the Company, I will deliver to the Company any and all drawings, notes, memoranda, specifications, devices, formulas, and documents together with all copies thereof, and any other material containing or disclosing any Company Inventions, Third Party Information or Proprietary Information of the Company."

Doc #: 65-12 at 5.

Adams argues that she did not breach the PIIA because it does not require that she return the laptop "as is" and because she followed the instructions of a May 16, 2019 email instructing her to delete all documents on personal devices. Doc. 72 at 18-19.

Adams did not produce the May 16, 2019 email, but she has consistently asserted that she was instructed to perform the factory reset. Doc #: 65-5 at 24 ("I believe there was something that I read that was sent to me at my e-mail address."); Doc #: 72-1 at ¶ 44 ("I returned the assigned laptop as I believed I was instructed by performing a factory reset . . . ."). Further, the Court notes that the separation agreement provides "[t]o the extent that Employee has any work-related files, emails, data, or information in electronic form on Employee's personal devices (or accessible therefrom), Employee further agrees to delete all such files, e-mails, data, and information." Doc.

40 at 127. From this evidence a jury could conclude that Stealthbits instructed Adams to perform a factory reset on her company laptop and, therefore, doing so did not violate the PIIA.

However, Adams admits that she retained a chart showing the potential customers with whom she was speaking. Doc. 65-5 at 67. Keeping the chart was plainly in violation of the PIIA.

Accordingly, the Court grants summary judgment on the issue that Adams breached the PIIA by retaining documents after the end of her employment. Damages resulting from the breach are to be determined at trial.

### 2. *Implied Covenant of Good Faith and Fair Dealing*

To prevail on a claim of breach of implied covenant of good faith and fair dealing, an essential element is that the party acted with a bad motive or intention. *Wade v. Kessler Inst.*, 778 A.2d 580, 589 (N.J. Super. Ct. App. Div. 2001). Here, Stealthbits asserts that "Adams breached that covenant by breaching the PIIA – she kept documents she agreed not to, and she willingly performed a factory reset on her computer to deprive Stealthbits of the benefits of its agreement." Doc. 65-1 at 20. However, a jury could conclude otherwise. Adams asserts she kept the documents to pursue the present litigation and factory reset the laptop believing that she was supposed to and to protect Stealthbits' information were the laptop to get lost. Doc. 65-5 at 26 – 27; 72-1 at ¶¶ 43, 44. A jury could believe these alternative reasons, which would not constitute a bad motive or intention. Thus, Stealthbits is not entitled to summary judgment on its claim for breach of implied covenant of good faith and fair dealing, Counterclaim IV.

### D. Misappropriation of Trade Secrets

Stealthbits moves for summary judgment on its counterclaims for misappropriation of confidential and proprietary information under Ohio and federal law, Counterclaims II and III.

The Ohio Uniform Trade Secrets Act ("OUTSA"), Ohio Rev. Code 1333.61 et seq., permits a civil action to enjoin actual or threatened misappropriation and recover damages for misappropriation of trade secrets. Ohio Rev. Code §§ 1333.62(A), 1333.63(A). The Sixth Circuit articulates the elements of misappropriation of trade secrets under Ohio law as: "(1) the existence of a trade secret; (2) acquisition of a trade secret as a result of a confidential relationship; and (3) unauthorized use of a trade secret." *Hoover Transp. Servs., Inc. v. Frye*, 77 F. App'x 776, 782 (6th Cir. 2003).[5] "Trade secret" includes business information, listing of names, and addresses or telephone numbers that satisfies both of the following:

> (1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
> (2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ohio Rev. Code § 1333.61(D).

Likewise, the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, permits the owner of a trade secret to bring a civil action to enjoin actual or threatened misappropriation and recover damages for misappropriation of trade secrets. 18 U.S.C. § 1836(b). The DTSA defines "misappropriation" as the:

> (A)     acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (B)     disclosure or use of a trade secret of another without express or implied consent by a person who—
>
> > (i)     used improper means to acquire knowledge of the trade secret;

---

[5] The court in *List Indus., Inc. v. Umina* astutely noted that the Sixth Circuit's articulation of the elements to establish a misappropriation of trade secrets predates and does not fully align with the OUTSA. No. 3:18-CV-199, 2021 WL 2916967, at *12 n. 11 (S.D. Ohio July 12, 2021). This discrepancy is of no import in the present case because the OUTSA's definition of misappropriation, as pertinent here, also requires the disclosure or use of a trade secret. *See* Ohio Rev. Code Ann. § 1333.61(B)(2).

      (ii)     at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—

            (I)     derived from or through a person who had used improper means to acquire the trade secret;

            (II)    acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or

            (III)   derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or

      (iii)    before a material change of the position of the person, knew or had reason to know that—

            (I)     the trade secret was a trade secret; and

            (II)    knowledge of the trade secret had been acquired by accident or mistake . . . .

18 U.S.C. § 1839(5). "Trade secret" includes business information which the owner has taken reasonable measures to keep secret and which derives value from not being generally known or ascertainable by another person who could obtain value from the disclosure or use of the information. 18 U.S.C. §1839(3).

     Stealthbits takes issue with Adams having printed from Stealthbits' systems "charts outlining business prospects and contacts." Doc. 79 at 15. Assuming without deciding that Stealthbits can prove its information constitutes trade secrets, Stealthbits is not entitled to summary judgment because it has failed to show at this stage that Adams misappropriated information.

     Stealthbits' theory of misappropriation expressed in its motion for summary judgment is that Adams violated the OUTSA and DTSA by having had access to trade secrets, including prospect lists and contacts, which she will inevitably disclose to her new employer. Doc. 65-1 at 20. Crucial to this theory is Ohio's inevitable disclosure doctrine, which provides that a threat of irreparable harm can be established where a former employee that had access to trade secrets

21

begins employment with a competitor in a substantially similar position. *Procter & Gamble Co. v. Stoneham*, 747 N.E.2d 268, 279 (2000); *Invacare Corp. v. Nordquist*, No. 1:18CV62, 2018 WL 2454523, at *6 (N.D. Ohio June 1, 2018). The inevitable disclosure doctrine requires that the movant present evidence in support of its argument. *Millennium Health, LLC v. Roberts*, No. 1:19CV2381, 2020 WL 2814440, at *18 (N.D. Ohio Mar. 4, 2020) (citing *Unique Paving Materials Corp. v. Fargnoli*, No. 07CV2501, 2008 WL 11383295, at *5 (N.D. Ohio Oct. 31, 2008), aff'd, 361 F. App'x 6889 (6th Cir. 2010)). Arguing only that "inappropriate use of the information is inevitable is not sufficient." *Id.* (citation omitted).

The inevitable disclosure doctrine does not support Stealthbits' claim for damages under the OUTSA and DTSA. The OUTSA requires proof of "the unauthorized use of a trade secret." *Frye*, 77 F. App'x at 782; Ohio Rev. Code § 1333.61(B)(2). Similarly, the DTSA requires proof of the unconsented disclosure or use of a trade secret. 18 U.S.C. § 1839(5)(B). Stealthbits does not assert that Adams used or disclosed any of its trade secrets.

Nor has Stealthbits made the requisite showing under the inevitable disclosure doctrine to support its claim for injunctive relief. While the OUTSA and DTSA permit an injunction when misappropriation is threatened and the inevitable disclosure doctrine establishes a threat of harm, Stealthbits has presented no evidence to support that disclosure of any information Adams obtained during her employment is inevitable. At best, Stealthbits suggests that Adams might someday use customer information she obtained during her employment for the benefit of her new employer. The Court finds that this baseless speculation is inadequate to grant summary judgment for an injunction under the OUTSA or DTSA.

Thus, Stealthbits has failed to meet its burden for summary judgment on its second and third Counterclaims.

**IV.     Conclusion**

For the above reasons, Stealthbits' motion for summary judgment is **GRANTED** in part and **DENIED** in part. Summary judgment is granted on Claims V, VII, VIII, XI, and XII of Adams' second amended complaint and those claims are dismissed.

**IT IS SO ORDERED**.

s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

DATE: January 3, 2022